SLT:NR
F.# 2012R01442

# 13 M   683

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

RONALD WILLIAMS,
    also known as "Blackman," and
    "Jurmaine,"
EZRA CLOUDEN,
    also known as "Bobo," and
AKEEM THOMPSON,

          Defendants.

- - - - - - - - - - - - - - - - -X

C O M P L A I N T

(T. 21, U.S.C., §§ 846
and 841(b)(1)(D))

EASTERN DISTRICT OF NEW YORK, SS:

        I, DAVID BROWN, being duly sworn, deposes and states

that he is a Special Agent of the United States Drug Enforcement

Administration ("DEA", )duly appointed according to law and

acting as such.

        Upon information and belief, on or about and between

March 12, 2013 and August 6, 2013, both dates being approximate

and inclusive, within the Eastern District of New York and

elsewhere, the defendants RONALD WILLIAMS, also known as

"Blackman," EZRA CLOUDEN, also known as "Bobo," and AKEEM

THOMPSON, together with others, did knowingly and intentionally

conspire to distribute and possess with intent to distribute a controlled substance, which offense a substance containing marijuana, in violation of Title 21, United States Code, 841(a)(1).

(Title 21, United States Code, Sections 846 and 841(b)(1)(D))

The source of your deponent's information and the grounds for her belief are as follows:1

1.    I am a Special Agent of DEA, duly appointed according to law and acting as such.  I have been a DEA Special Agent for approximately one year and am currently assigned to the New York Office.  I am tasked with investigating narcotics trafficking, and other criminal conduct involving narcotics, including armed robberies.  These investigations are conducted both in an undercover and overt capacity.  I have participated in investigations involving search warrants and arrest warrants. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

---

[1]    Because the purpose of this Complaint is to state only probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

2.    I am currently involved in an investigation of
the Bloodstains Crew, also known as the 90's Crew (the
"Bloodstains").  This investigation is being conducted by the
DEA in conjunction with the United States Department of Homeland
Security, Homeland Security Investigations ("HSI"), the New York
Police Department ("NYPD"), the Bureau of Alcohol, Tobacco,
Firearms, and Explosives ("ATF"), and the United States Marshals
Service ("USMS").  The Bloodstains are a violent street gang
operating out of Brooklyn, New York, which is engaged in
narcotics trafficking.

3.    During the course of the investigation,
investigative agents received information about the narcotics
trafficking activities and acts of violence committed by
Bloodstains members from a confidential informant who has
provided reliable information in the past and whose information
has led to the seizure of narcotics and firearms (the "CI").  CI
was providing information in return for pay and due to personal
animosity with Williams.  CI was deactivated as a confidential
informant based on an arrest that was unrelated to Bloodstains
activity.  According to the CI, the Bloodstains operated in
Brooklyn since at least 2007.  The CI indicated that the
Bloodstains in the sale of marijuana and ecstasy in the New York

area. The CI identified WILLIAMS as a member of the Bloodstains, and identified Sheldon Shorter, also known as "Jungeman," "Jungliss" and "Junglist" as a member of the Bloodstains who is currently incarcerated.

4. On March 11, 2013, the Honorable Margo K. Brodie of the United States District Court for the Eastern District of New York authorized the interception of wire communications for the telephone with the number (347) 922-2701, which was utilized by RONALD WILLIAMS (the "WILLIAMS Phone"). Judge Brodie also signed a search warrant authorizing agents to obtain location data associated with the WILLIAMS Phone. Interception of that phone began on March 12, 2013.

5. On April 10, 2013, the Honorable Kiyo A. Matsumoto of the United States District Court for the Eastern District of New York authorized the continued interception of wire communications and the commencement of interception of electronic communications for the WILLIAMS Phone. Judge Matsumoto also signed a search warrant authorizing agents to obtain location data associated with the WILLIAMS Phone. Judge Matsumoto's order expired on May 10, 2013, and interception was terminated.

6.   As part of the wire investigation, law enforcement agents intercepted numerous telephone calls in which defendants RONALD WILLIAMS, EZRA CLOUDEN and AKEEM THOMPSON discussed narcotics trafficking and, in some instances, threatened acts of violence in furtherance of their drug trafficking operation.

7.   On Thursday, March 19, 2013, law enforcement agents intercepted a series of calls between WILLIAMS and an individual identified as D'Wayne Blackwood, also known as "Butcher" (hereinafter "Butcher").

8.   At 11:33 a.m. on March 19, 2013, WILLIAMS placed an outgoing call to an unidentified male.  WILLIAMS requested that the unidentified male ("UM 1") connect with "Butcher" on a three-way call with WILLIAMS because "Butcher" had not been answering WILLIAMS' calls.  WILLIAMS further stated "that is why I wanted you to three-way him and give him a message and let him know that I'm going to park out by his house and nobody can defend him because I want mine."  Later in the call, WILLIAMS stated "I'm going to knock out his [Butcher's] skull."

9.   In the same call, WILLIAMS made reference to being "robbed" by "Butcher" and discussed "weed" that "Butcher" had provided to another individual.  Based on my training and

experience and the progress of this investigation to date, I believe that WILLIAMS was discussing committing acts of violence against "Butcher" based on a dispute relating to the distribution of marijuana.

10. On Tuesday, March 19, 2013 at 11:43 a.m., law enforcment intercepted a call from WILLIAMS to "Butcher." The conversation included the following exchange:

WILLIAMS:       You know because you carried my weed and sold it to bombo claat [profanity] Boy Boy.

"BUTCHER":      I got a different thing from a youth and gave it to Boy Boy.

WILLIAMS:       Listen man, you are the one who [U/I] bumbo claat [U/I] thing. What is wrong with you Butcher, I'm going to shoot you into your face... you can go and tell Sugar I said I'm going to mash up your blood claat [profanity] for my things.

Based on my training and experience, and the progress of the investigation to date, I believe that the reference to "my weed" referred to marijuana that WILLIAMS believed was intended for sale to WILLIAMS. I further believe that WILLIAMS was threatening "Butcher" because "Butcher" had failed to sell marijuana to WILLIAMS.

11. Shortly after the call described in paragraph 10, WILLIAMS again placed a call to "Butcher." At 11:45 a.m. on

March 19, 2013, agents intercepted a call during which the

following exchange occurred:

WILLIAMS:       I want you to remember I know where you live and
                I want you to take it as a threat.  You hear, you
                better look over your shoulder, Butcher.  That is
                what I'm blood claat telling you and nobody can't
                [U/I].

"BUTCHER":      So, that is what the whole of the thing come
                down to, brother.

WILLIAMS:       No man can blood claat save you, no man can save
                you.  You are going on as if you take man for a
                fool after you robbed man things.  Hey, boy, what
                is wrong with you butcher?  No man can card
                [scam] me, you know.

"BUTCHER":      I don't have your things brother.  I
                don't have your things, I got stuck up and I took
                Tedroy your thing.

WILLIAMS:       Butcher, go and suck your mother and bring my
                thing before the evening is done or I'm going to
                put you into a body bag.  Listen to me, I swear
                to you.  I'm going to put you into a body bag and
                not even Sugar can [U/I].  All he can do is bury
                your blood claat [profanity].

Based on my training and experience and the investigation that

has been conducted thus far, I believe that in this

conversation, WILLIAMS is threatening "Butcher" in connection

with narcotics that he believed had been robbed.

          12.  On March 22, 2013 at 2:46 p.m., agents

intercepted an incoming call to WILLIAMS from an unidentified

male ("UM 2").  During this call, UM 2 and WILLIAMS discussed a

package and UM 1 provided WILLIAMS with the following address information:  "Randolph Benson, 723 East 216th Street, Bronx, NY 10467."  UM 2 also provided WILLIAMS with a tracking number for the package and informed WILLIAMS that the sender of the package was identified as "Marie Chin" from California.  Approximately twenty minutes later at 3:08 p.m. (Call No. 1484), WILLIAMS called the customer service line for the United States Postal Service, providing the telephone number for the WILLIAMS Phone, identifying himself as "Randolph Benson" and providing the Bronx address described above.  WILLIAMS sought to re-schedule the delivery of the package.  At approximately, 3:15 p.m., WILLIAMS placed an outgoing call to UM 2 (Call 1485).  UM 2 asked WILLIAMS if WILLIAMS could have someone with a false identification card (a "cheap twenty dollar ID") go and pick-up the package.  UM 2 also stated that there were "nine tunes" waiting in the Post Office.

13.  On March 25, 2013, agents seized a package bearing the same address information and tracking number as the package described in paragraph 12.  The package, which was opened based on the consent of the individual who came to retrieve it, contained approximately 9 pounds of marijuana. That individual, Rondail Henry, was carrying a false

identification card in the name of "Randolph Benson." Henry, who was arrested and subsequently released, claimed that he had been paid by an individual he identified as "Hess" to pick-up the package and that he was unaware of its content. Henry further stated that an individual who he identified as "Blacks" had picked him and driven him to the post office.

14. On April 17, 2013 at 1:39 p.m. (Call No. 1210), WILLIAMS placed a call to an individual subsequently identified as Leon Campbell, also known as "Country" (herein after "Campbell"). During that call, WILLIAMS asked Campbell if Campbell knows anyone who uses "little toddlers," not the "big ones." Campbell then asked WILLIAMS to clarify what WILLIAMS was asking about. WILLIAMS told Campbell that WILLIAMS was not talking about the "swallow thing," rather, he [WILLIAMS] was talking about the "little reggae one" and the "small one." Campbell then asked WILLIAMS how much they are being sold for and WILLIAMS responds that the "dog" says "6.5," but that WILLIAMS might have to negotiate.

15. Based on my training and experience and the investigation that has been conducted thus far, I believe that WILLIAMS and Campbell were discussing the sale of narcotics that were in the possession of WILLIAMS. Specifically, I believe

that "little toddlers," "little reggae one" and the "small one," refer to a type of marijuana and that the reference to "6.5" referred to the price for an unspecified quantity of marijuana.

16. On April 17, 2013 at 2:24 p.m. (Call No. 1219), WILLIAMS received a call from Campbell. During that call, Campbell asked WILLIAMS what he was "dropping" them for. WILLIAMS informed Campbell that the price was "six and a half," but that he was going to try to negotiate the price down. Campbell then told WILLIAMS that he wanted to see what WILLIAMS "was working with," and that he was coming to see WILLIAMS.

17. On April 23, 2013 at 2:30 p.m. (Call No. 2122), WILLIAMS placed a call to Campbell. During this call, Campbell asked WILLIAMS if WILLIAMS still had the "6.5" and WILLIAMS stated that he did. Based on my training and experience, and the investigation to date, I believe that WILLIAMS was informing Campbell that WILLIAMS was still in the possession of marijuana to be sold to third parties.

18. On April 29, 2013 at 6:38 p.m. (Call No. 3106), agents intercepted a call from WILLIAMS to an unidentified male ("UM 3"). During that calls, WILLIAMS and "UM3" had the following exchange:

UM 3:        Yeah yeah how the thing them, how you view the
             thing them?

WILLIAMS:    Boy I am not lying brother but you already know,
             that is why I don't even bother complain cause I
             know you always come with the top but [U/I] you
             I.

UM 3:        Nothing was going on my side.  You know [U/I].

WILLIAMS:    You don't have to explain man, you know what I am
             saying.

UM 3:        Yeah.

WILLIAMS:    It is what it is man.

UM 3:        Alright.

WILLIAMS:    Cause it burns wicked, wicked, wicked it is just
             the look, you know.

UM 3:        I don't hear you.

WILLIAMS:    It burns wicked, wicked, wicked, wicked it is
             just the look star.

UM 3:        The, the tight nit.

WILLIAMS:    Yeah.

UM 3:        Cause the color range is not too bad.

WILLIAMS:    True none at all.

UM 3:        Its just the tightness.

WILLIAMS:    Yeah because a man refused it yesterday but you
             done know we are working with it same way man.  I
             am good man.

Based on my training and experience, and the investigation to date, I believe that WILLIAMS and UM 3 were discussing the quality of the marijuana that the UM 3 had supplied to WILLIAMS and the fact that WILLIAMS was having difficulty selling it to his customers. Location information for the WILLIAMS Phone, obtained pursuant to a search warrant, placed the WILLIAMS Phone in the vicinity of 149 East 96th Street, Apt. 1F, Brooklyn, New York (the "WILLIAMS Residence") approximately 15 minutes prior to this call.

19. On April 29, 2013 at 10:16 p.m. (Call No. 3134), agents intercepted a call from WILLIAMS to an unidentified male ("UM 4"). During that calls, WILLIAMS and UM 3 had the following exchange:

WILLIAMS:       Yeah, because they are saying "boy brother, the color is there but that looks like some reggae [U/I].

UM 4:           That's what they said, it looks like some reggae?

WILLIAMS:       Yeah, because those black [U/I] regular.

UM 4:           Because they what?

WILLIAMS:       Because the black grains are on them, too.   The pebbles.   The pebbles?

UM 4:           I did not see any black ... any black pebbles on them.

WILLIAMS:        Yeah man [U/I] black pebbles.  Brother, like I
                 told you I'm going to do what I'm doing, still,
                 but they are complaining.

WILLIAMS:        Yeah man it has black pebbles.

WILLIAMS:        I had to end up pulling one of them just to see
                 how it would look in the bag.  ....

UM 4:            All right, see what you can do with them.

WILLIAMS:        [u/I] is going to give me a thing and I will just
                 blend on it, you know.

Based on my training and experience, and the investigation to

date, I believe that WILLIAMS and UM 4 were discussing

difficulties that WILLIAMS' was having selling marijuana to

customers.  Specifically, I believe that WILLIAMS' customers

were complaining about the presence of "black pebbles" in or on

the marijuana and that Williams was planning to "blend" this

marijuana with other marijuana to improve his ability to sell

the narcotics.

        20.  On April 29, 2013 at 10:40 p.m. (Call No. 3144),

agents intercepted a call from WILLIAMS to an individual known

as "Bobo" (subsequently identified as defendant EZRA CLOUDEN).

During that call, Williams and "Bobo" had the following

exchange:

WILLIAMS:        I had something else but it kind of flat too that
                 is why I did not even link you on it.

CLOUDEN:        Is it kind of flat?

WILLIAMS:       Yeah it is green and nice and it burns wicked but
                it is flat.

Based on my training and experience, and the investigation to
date, I believe WILLIAMS and CLOUDEN were discussing the quality
and properties of marijuana that was in Williams' possession.
As discussed at greater length below, in a post-arrest statement
to agents, EZRA CLOUDEN indicated that he is known by the
nickname "Bobo" and has purchased marijuana from RONALD
WILLIAMS.

        21.  On April 30, 2013 at 2:31 p.m. (Call No. 3197),
agents intercepted a call to WILLIAMS from an individual
referred to as "Boy Boy".  During that call, "Boy Boy" asked
WILLIAMS if he still had the "things" and WILLIAMS answered
affirmatively.  Location information for the WILLIAMS Phone,
obtained pursuant to a search warrant, places the WILLIAMS Phone
in the vicinity of the WILLIAMS Residence at the time of this
call.  Based on my training and experience, and the
investigation to date, I believe that the "things" about which
"Boy Boy" was inquiring refers to marijuana.

        22.  On March 30, 2013 at 10:41 a.m. (Call No. 2585),

agents intercepted a call that was placed to the WILLIAMS Phone
by defendant AKEEM THOMPSON.  During that calls, THOMPSON asked
WILLIAMS if WILLIAMS "had separated the two," and WILLIAMS
responded "yes."  THOMPSON then told WILLIAMS to give to "Zippo"
who was "outside at the door."  WILLIAMS then asked THOMPSON if
the individual "was going to give any rubbish" and THOMPSON
responded that he "was going to sort it out."

      23.  Based on my training and experience and the
investigation, I believe that WILLIAMS and THOMPSON were
discussing the sale of marijuana to "Zippo."  I believe that the
"rubbish" is a reference to money and that WILLIAMS is asking
THOMPSON who will pay for the narcotics.

### The August 6, 2013 Search of Williams' Residence

      24.  On August 6, 2013, at approximately 9:30 p.m.,
law enforcement agents executed a judicially authorized search
warrant at the WILLIAMS Residence.  During that search, law
enforcement agents recovered approximately three pounds of
marijuana inside the WILLIAMS Residence.  The marijuana was
stored in three clear plastic baggies, inside of larger black
garbage bag hanging a hook in the closet of the bedroom.  In
addition, agents recovered a loaded Smith & Wesson .40 caliber

firearm, model 40ve, with a defaced serial number in the kitchen cabinet of the WILLIAMS Residence.

25. Law enforcement agents also obtained consent from a resident of 149 East 96th Street, Brooklyn, New York, to search the roof of that building. In a second floor landing, adjacent to the door to the roof, which was common area, accessible to each apartment in the building, agents also discovered two additional firearms, a box of ammunition and a loose round of ammunition. The two firearms recovered were (1) a Raven Arms .25 caliber, model-MP25, serial number 1382875 and (2) a Smith & Wesson .22 caliber, model 41, serial number A117126.

26. WILLIAMS, CLOUDEN and THOMPSON were each apprehended and placed under arrest in the hallway area outside of the WILLIAMS Residence. THOMPSON was attempting to lock the door to the WILLIAMS Residence when agents entered the building.

27. Following his arrest, the defendant EZRA CLOUDEN waived his Miranda rights and agreed to make a statement to DEA agents. In sum and substance and in part, CLOUDEN admitted that he had purchased approximately a half pound of marijuana each week from WILLIAMS and THOMPSON for the past two years. CLOUDEN stated that he would purchase the marijuana in quarter pound quantities for approximately $250 in United States currency and

would re-sell it for approximately $400.  CLOUDEN further stated
that he would arrange purchases by calling WILLIAMS or THOMPSON.
He further indicated that he would receive the narcotics in
front of the WILLIAMS Residence and that it would be provided to
him by THOMPSON or other individuals.

28.  Following his arrest, the defendant RONALD
WILLIAMS waived his Miranda rights and agreed to make a
statement to DEA agents.  In sum and substance and in part,
WILLIAMS admitted that he was involved in the sale of marijuana
and that he directs others in doing so.  WILLIAMS also
acknowledged previously being involved in robberies of narcotics
dealers.  WILLIAMS further acknowledged having an association
with Sheldon Shorter, also known as "Junglist."  WILLIAMS denied
ownership of the firearm recovered in the WILLIAMS Residence and
of the two firearms recovered from the second floor landing.

Additional Conversations Relating to Violence and Firearms

29.  On March 15, 2013, WILLIAMS was intercepted on a
call (Call No. 463) with an unidentified female ("UF 1").
During that call, Williams stated "I'm walking back around the
corner, man ... I have my gun with me."  Subsequently, in the
same call, he stated "I've already reached back at the corner of
ninety sixth man, I'm going to go put my shit down."  Based on

my training and experience and the investigation to date, I believe that WILLIAMS' reference to "put my shit down," referred to returning his firearm to the Williams' Residence, which is located on East 96th Street in Brooklyn.

30.    Law enforcement agents intercepted three calls between WILLIAMS and Leon Campbell on April 30, 2013 relating to Campbell hiring WILLIAMS to kill an individual that Campbell believed was providing information to federal law enforcement agents about a narcotics transaction. On July 16, 2013, a grand jury in the Eastern District of New York charged Campbell in a four-count indictment with, inter alia, conspiracy to use a facility of interstate commerce with intent to murder in violation of 18 U.S.C. § 1958; and solicitation to commit a crime of violence in violation of 18 U.S.C. § 373, based, in part, on the calls between WILLIAMS and Campbell. In one of the intercepted calls, WILLIAMS indicated that he had called other individuals in connection with the murder contract.

31.    In post-arrest statements, WILLIAMS acknowledged his participation in these calls with Campbell. WILLIAMS stated, in sum and substance and in part, that he intended to steal the money Campbell was going to bring to him as a payment

for the murder contract.  He further stated that Campbell had
previously contacted him about killing another individual.

32.  On April 23, 2013 at 2:30 p.m. (Call No. 2122),
WILLIAMS placed a call to Campbell.  During this call, Campbell
asked WILLIAMS if WILLIAMS still had the "6.5" and WILLIAMS
stated that he did.  Campbell informed WILLIAMS that Campbell
also has "some."  Campbell then informed WILLIAMS that he had
seen an unidentified individual ("UM 6") the other day.  UM 6
had given Campbell "eight," which Campbell sold, returning half
of the proceeds to UM 6.  Campbell told WILLIAMS that he had
been to UM 6's house, that the basement is full and that UM 6
had given him "forty" last night.  Further, UM 6 told Campbell
that UM 6 could give Campbell "one hundred" if Campbell was
"working."

33.  WILLIAMS then suggested that they should go
"clean out" UM 6's house because WILLIAMS does not have any
money.  Campbell informed WILLIAMS that UM 6's basement was full
of "weed," and that the next shipment is due to arrive on
Saturday.  Campbell mentioned that UM 6 referred to his basement
as the "Lab."  Campbell further suggested to WILLIAMS that the
best day to hit UM 6 would be on Saturday, because UM 6 would be
receiving a new shipment of narcotics and then leave his home to

play football. Based on my training and experience, I believe
that WILLIAMS and Campbell were discussing Campbell's prior
purchase of marijuana from UM 6. In addition, I believe that
WILLIAMS and Campbell were discussing a plan to steal marijuana
from UM 6's home after UM 6 had received a new shipment of
marijuana.

34. On Sunday, April 28, Campbell called WILLIAMS at
12:52 p.m. (Call No. 2877). During that call, WILLIAMS again
discussed "clean[ing] out the man" as "I am broke dog."
Campbell then proposed having WILLIAMS call the target and
telling the man that he has $4,000 to purchase narcotics and
that he then go "take the thing dog."

35. On the same date (Call No 2910), WILLIAMS picked
up a call from Campbell at 3:29 p.m. while on another call.
Campbell told WILLIAMS that he saw someone named Addy picking up
a bag from a truck and described the location of the truck.
WILLIAMS told Campbell he was going to call one of his men to
come meet with Campbell.

36. At 3:31 p.m., Campbell called WILLIAMS and stated
that the individual had left the area but the truck remained
parked in the vicinity. WILLIAMS inquired if any one was in the
truck and Campbell indicated that he did not know. At 3:52

p.m., Williams spoke with an individual identified as "Roy" and told him that he had a job for Roy but now it is too late. Based on my training and experience and the investigation thus far, I believe that WILLIAMS intended to use "Roy" - one of his "men" - for the drug robbery WILLIAMS was planning with Campbell [the "job"].

37.  The defendant RONALD WILLIAMS has a 2009 conviction for criminal possession of a firearm in the 3rd degree and a 2010 conviction for attempted assault in the 2nd degree.

38.  The defendant EZRA CLOUDEN has a 2011 New York State misdemeanor conviction for criminal possession of a controlled substance in the 4th degree.

WHEREFORE, your deponent respectfully requests that the defendants RONALD WILLIAMS, also known as "Blackman" and "Jermaine," EXRA CLOUDEN, also known as "Bobo" and AKEEM THOMPSON be dealt with according to law.

_____
David Brown
Special Agent
Drug Enforcement Administration

Sworn to before me this
7th day of August, 2013