```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
UNITED STATES OF AMERICA,                  :
                                           :
             -against-                     :
                                           :                MEMORANDUM AND ORDER
RONALD WILLIAMS,                           :                13-CR-419 (S-2) (DLI)
also known as "Blackman,"                  :
"Jermaine," "Leon Gordon,"                 :
and "Marcus Reese,"                        :
                                           :
             Defendant.                    :
----------------------------------------------------------- X
```

**DORA L. IRIZARRY, Chief Judge:**

On April 24, 2015, Ronald Williams ("Defendant" or "Williams"), filed a motion to suppress wiretap evidence, physical evidence, and statements Defendant made to law enforcement agents. *See* Defendant's Motion to Suppress ("Def. Mot. Sup."), Dkt. Entry No. 142. The government opposed it. *See* Government's Memorandum in Opposition ("Gov't Op."), Dkt. Entry No. 154. For the reasons set forth below, Defendant's motion is denied in its entirety.

## BACKGROUND

On August 15, 2013, the government filed a superseding criminal complaint against Defendant based on information obtained pursuant to a law enforcement investigation. *See* Superseding Criminal Complaint (the "Complaint"), Dkt. Entry No. 15. The target of the investigation was a violent street gang operating out of Brooklyn, New York known as the "90's Crew" or the "Bloodstains Crew" (the "Bloodstains"). Complaint at ¶ 2. According to the Complaint, the Bloodstains' criminal activities included narcotics trafficking, armed robberies of rival drug dealers, and other acts of violence, including murders. *Id.* Defendant allegedly rose to a leadership position within the organization after the arrest and deportation of the Bloodstains' former leader. *Id.* at ¶ 4. An unindicted co-conspirator named Leo Powell ("Powell") was a

1

member of the Bloodstains who allegedly cooked and distributed crack-cocaine. Def. Mot. Sup., Ex. 7, at ¶ 16.

As part of its investigation of the Bloodstains, the government sought judicially authorized wiretaps on a telephones used by Powell (the "Powell Telephone") and Defendant (the "Williams Telephone"). Special Agent Todd Kowalski of the Department of Homeland Security submitted an affidavit in support of the government's application for a wiretap on the Powell Telephone. *See* Affidavit in Support of Wiretap of Powell Telephone (the "Powell Wiretap Affidavit"), Def. Mot. Sup., Ex. 7. On February 27, 2013, the Hon. Margo K. Brodie, United States District Judge, authorized the interception of wire communications on the Powell Telephone (the "Powell Wiretap"). Based in part on information discovered from the Powell Wiretap, Special Agent Kowalski submitted another affidavit in support of the government's application for a wiretap on the Williams Telephone. *See* Affidavit in Support of Wiretap on Williams Telephone (the "Williams Wiretap Affidavit"), Def. Mot. Sup., Ex. 5. On March 11, 2013, Judge Brodie authorized the interception of wire communications on the Williams Telephone (the "Williams Wiretap"). Special Agent Kowalski then submitted an affidavit in support of an extension of the Williams Wiretap. *See* Affidavit in Support of Extension (the "Williams Extension Affidavit"), Def. Mot. Sup., Ex. 6. On April 10, 2013, the Hon. Kiyo Matsumoto, United States District Judge, authorized the continued interception of wire communications and the commencement of electronic communications on the Williams Telephone (the "Williams Wiretap Extension").

Based in part on information obtained from these wiretaps, the government sought a search warrant of Defendant's apartment located in Brooklyn, New York (the "Williams Apartment"). Special Agent Kowalski submitted an affidavit in support of the search warrant application. *See* Affidavit in Support of Search Warrant (the "Search Warrant Affidavit"), Def. Mot. Sup., Ex. 1.

On August 5, 2013, the Hon. James Orenstein, United States Magistrate Judge, issued a search warrant for the Williams Apartment (the "Search Warrant"). On August 6, 2013, law enforcement agents searched the Williams Apartment and found a loaded firearm in the kitchen. Gov't Op. at 19. The agents also obtained written consent from another building resident to search the roof of the apartment building. *See* Report of Investigation Continuation, Def. Mot Sup., Ex. 2. The ensuing search of the roof resulted in the discovery of two additional firearms and a black plastic bag of ammunition. *Id.*

The agents arrested Defendant and advised him of his *Miranda* rights, which he waived orally. *See*, Report of Investigation, Def. Mot. Sup., Ex. 3. Defendant admitted to the agents that he sold marijuana in the vicinity of the Williams Apartment, but only in small quantities. *Id.* He also stated that he had assumed a leadership position within the Bloodstains following the arrest of other Bloodstains associates. *Id.* Defendant also discussed an individual named "Country," who had offered Defendant $5,000 to murder an informant. *Id.* Defendant told the agents that he had planned to rob County of the $5,000, but that he had no intention of carrying out the murder. *Id.*

On April 20, 2015, a grand jury within the Eastern District of New York returned a second superseding indictment[1] charging Defendant with: (1) participating in a marijuana distribution conspiracy in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C) (Count One); (2) conspiracy to commit obstruction of justice murder in violation of 18 U.S.C. §§ 1512(k) and 1512(a)(3)(B)(i)

---

[1] On July 16, 2013, a grand jury within the Eastern District of New York returned the initial indictment charging co-defendant Leon Campbell ("Campbell") only with drug trafficking and other murder related crimes. On September 5, 2013, a grand jury within the Eastern District of New York returned the first superseding indictment (the "First Superseding Indictment"), adding Williams as a defendant to some, but not all of the charges brought against Campbell in the original indictment. The First Superseding Indictment also added a firearms charge against Williams only, and another firearms charge against both Williams and Campbell.

(Count Two); (3) participating in a murder-for-hire conspiracy in violation of 18 U.S.C. § 1958(a) (Count Three); (4) being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2) (Count Five); (5) use of a firearm in connection with drug trafficking crime and crimes of violence in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Six); and (6) Hobbs Act robbery conspiracy in violation of 18 U.S.C. § 1951(a) (Count Seven). *See* Second Superseding Indictment, at 1-4.[2]

## DISCUSSION

**I.   The Wiretaps**

Defendant argues that Special Agent Kowalski's affidavits in support of the applications for the wiretaps were insufficient to support a finding of probable cause. Def. Mot. Sup. at 6. Alternatively, he argues that the wiretap evidence should be suppressed because the government did not explain why alternative investigative techniques had failed or were likely to have failed, as required by statute. *Id.*

**(A)   Probable Cause**

18 U.S.C. § 2518 sets forth the requirements for authorization of a wiretap. In pertinent part, § 2518(3) requires that the government establish and the issuing judge find:

> (a)   there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in Section 2516 of this chapter;
>
> (b)   there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

* * *

---

[2] The Second Superseding Indictment charges Campbell as to Counts One, Two, Three, Four (Solicitation of Murder in violation of 18 U.S.C. § 373), and Seven.

(c) there is probable cause for belief that the facilities from which, or the place where, the . . . oral . . . communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

The standard for evaluating whether the government established probable cause with respect to these requirements is the same as that for a search warrant. *See United States v. Fury*, 554 F. 2d 522, 530 (2d Cir. 1977). Accordingly, the government establishes probable cause with respect to the requirements of § 2518 when the "totality of the circumstances" indicates merely "a probability, and not a prima facie showing, of criminal activity." *Illinois v. Gates*, 462 U.S. 213, 230-32 (1983).

The Supreme Court repeatedly has emphasized that "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review." *Id.* at 236. Instead, "a magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Id.* (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). Courts must refrain from invalidating judicially authorized warrants based on "hypertechnical" interpretations of affidavits. *United States v. Ventresca*, 380 U.S. 102, 107 (1965).

Under the totality of the circumstances test, the issuing judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. When applying the totality of the circumstances test to information supplied by informants, the "core question … is whether the information is reliable." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993). The reliability of information supplied by an informant depends on whether "the person providing the information has a track record of providing reliable

information, or if [the information] is corroborated in material respects by independent evidence." *Id.* at 72-73; *see also Gates*, 462 U.S. at 241 (emphasizing "the value of corroboration of details of an informant's tip by independent police work."). Where an informant has provided a substantial amount of reliable and corroborated information, "it is a permissible inference that the informant is reliable and … other information that he provides, though uncorroborated, is also reliable." *Wagner*, 989 F.2d at 73; *see also Spinelli*, 393 U.S. at 427 (White, J., concurring) ("Because an informant is right about some things, he is more probably right about other facts.").

    (1)    The Powell Wiretap

Defendant generally attacks all three affidavits submitted in support of the wiretap applications on the ground that they suffer from the same defect. Def. Mot. Supp. at 7. Defendant claims that the affidavits in question "all rel[ied] on … the unjustified assertion that apparently innocuous words" intercepted from the Powell Wiretap "related to criminal activity." *Id*. The initial problem with this argument with respect to the Powell Wiretap is that, as a matter of logic, the affidavit *supporting* the Powell Wiretap could not have "relied on" information *intercepted from* the Powell Wiretap, because that wiretap had not yet been authorized and interceptions had not commenced. As discussed in greater detail below, the Powell Wiretap Affidavit primarily relied on information provided by two confidential informants, not wiretap intercepts. Defendant's only other argument against the Powell Wiretap Affidavit is the unadorned assertion that it "failed to demonstrate probable cause." *Id.* at 6. This argument fails.

The information supporting Judge Brodie's probable cause determination for the issuance of the Powell Wiretap came from two confidential informants, identified in the Powell Wiretap Affidavit as "CI-1" and "CI-2." Powell Wiretap Affidavit at ¶¶14-19. CI-1 was an associate of several members of the Bloodstains, who provided detailed information about the organization's

6

criminal activities, leadership, and structure. *Id.* at ¶¶ 14-18. CI-1 stated that Defendant was responsible for the day-to-day operations of the Bloodstains, and that Powell cooked and distributed crack-cocaine. *Id.* at ¶¶ 15-16. CI-2 provided generally the same information as CI-1, except with less detail. *Id.* at ¶ 19. Assuming the information provided by these confidential informants was reliable, it is more than sufficient to satisfy probable cause. Thus, the focus of the inquiry here is the veracity of CI-1 and CI-2. *See Wagner*, 989 F.2d at 73 (noting that "if the [confidential informant] was telling the truth to [law enforcement], then probable cause to believe that criminal activity was being conducted in [the defendant's] home is easily established in light of the" nature of the information provided).

According to the Powell Wiretap Affidavit, CI-1 was a source for approximately five months and consistently provided reliable information to law enforcement agents. Powell Wiretap Affidavit at ¶ 14. Similarly CI-2, was a confidential informant for approximately three months and also consistently provided reliable information. *Id.* at ¶ 19. The proven track records of CI-1 and CI-2, by themselves, are sufficient to support a finding of probable cause in this instance. *Wagner*, 989 F.2d at 73 ("[I]nformation provided by an informant from whom the government has received consistently reliable information in the past is likely to be sufficiently reliable to establish probable cause."). However, there is more.

Information provided by these informants also was corroborated independently by law enforcement agents. First, CI-1 stated that, while at the Williams Apartment on November 12, 2012, he observed Defendant discuss narcotics related activity with Powell over the telephone on three separate occasions. Powell Wiretap Affidavit at ¶ 31. CI-1 reported that one conversation occurred during the early morning of November 12, 2012, and the other two conversations occurred that night. *Id.* Both CI-1 and CI-2 informed Special Agent Kowalski that, in November

2012, Defendant used a telephone associated with the number 347-830-5943 (the "5943 Telephone"). *Id.* at ¶ 32. Toll records for the 5943 Telephone revealed that on November 12, 2012, there were three calls between the 5943 Telephone and the Powell Telephone that occurred at 1:47 a.m., 10:47 p.m., and 11:14 p.m., respectively. *Id.*

Toll records of the Powell Telephone also corroborated information provided by CI-2, who informed Special Agent Kowalski that, in approximately mid-December 2012, Defendant stopped using the 5943 Telephone and starting using a telephone associated with the number 929-421-0419 (the "0419 Telephone"). *Id.* at ¶ 64. Toll records show that the last call between the Powell Telephone and the 5943 Telephone occurred on December 16, 2012, and the first call between the Powell Telephone and the 0419 Telephone took place on December 29, 2012. *Id.* at ¶¶ 64-65. CI-2 further advised that, in approximately early February 2013, Defendant stopped using the 0419 Telephone and started using the Williams Telephone. *Id.* at ¶ 66. Toll records indicate that the last phone call between the Powell Telephone and the 0419 Telephone occurred on February 1, 2013, and the first call between the Powell Telephone and the Williams Telephone took place on February 5, 2013. *Id.* at 65-66.

Agent Kowalski's corroboration of the information provided by the confidential informants sufficiently established their veracity. Combined with the fact that these informants consistently provided reliable information, there was more than enough evidence to support Judge Brodie's probable cause determination. As this determination is entitled to "great deference," this Court will not disturb it. *Spinelli*, 393 U.S. at 419.

  (2)  The Williams Wiretap

The Williams Wiretap Affidavit contains excerpts from conversations intercepted over the Powell Wiretap which, according to Agent Kowalski, refer to criminal activity. Defendant's

argument rests on his assertion that Agent Kowalski unreasonably inferred evidence of criminal wrongdoing from these intercepts. Defendant characterizes the excerpts in question as "innocuous" and "non-incriminating." Def. Mot. Sup. 6-7.

As a threshold matter, Defendant's focus on these two excerpts is misguided, as the relevant issue is whether, considering the *totality of the circumstances*, the affidavit in question was sufficient to establish probable cause. Even if the Court accepted the argument that the intercepted conversations were innocent, the remainder of the Williams Wiretap Affidavit provides ample evidence of criminal activity. For example, the Williams Wiretap Affidavit relied on the same information supplied by CI-1 and CI-2 that the government offered in support of the Powell Wiretap Affidavit. As previously noted, these informants are reliable, and the information they provided supported Judge Brodie's probable cause determination as to the Powell Wiretap and the Williams Wiretap.

Furthermore, Defendant's arguments regarding the Powell Wiretap intercepts fall short on the merits. In the first excerpt, Defendant tells Powell that Defendant "need[s] some money" and then asks Powell, "What are you dealing with?" Williams Wiretap Affidavit at ¶ 49. The excerpt ends with Defendant threatening Powell by saying "if I get mad, you are not going to like it." *Id.* According to Agent Kowalski, Defendant was threatening Powell to obtain money that was the proceeds of Powell's narcotics trafficking. *Id.* at ¶ 50. Defendant describes this interpretation of the conversation as "incredibl[e]" and unsupported. Def. Mot. Sup. at 8. While it is true that neither Defendant nor Powell mentions narcotics trafficking during the conversation, other evidence supports Agent Kowalski's inference. For example, numerous confidential informants, including CI-1 and CI-2, informed Agent Kowalski that Powell and Defendant were active members of the Bloodstains, a narcotics trafficking organization. Moreover, the telephone

9

conversations between Defendant and Powell that occurred on November 12, 2012, which CI-1 witnessed, related to narcotics trafficking. Thus, it was reasonable for Special Agent Kowalski, a seasoned investigator of these types of cases, to infer that two members of a narcotics trafficking organization, who had previously been observed discussing narcotics activity, were discussing illicit narcotics proceeds during the conversation in question.

The second excerpt challenged by Defendant involves a telephone call between Powell and an individual named Winston Page. The conversation begins with Powell saying, "I shouted Tom just now; it seems like Tom's phone chipped out or something … like its dead or something." Williams Wiretap Affidavit at ¶ 51. Powell then states that "[Tom] broke his phone" to which Page replies, "How are you going to break your money tree?" *Id.* Agent Kowalski averred that "Tom" is a pseudonym for Williams, and that the term "money tree" refers to the Williams Telephone, which Agent Kowalski believed Williams used for narcotics trafficking. *Id.* at ¶ 52. Defendant finds these inferences "astonishing" and "far-fetched," but it is difficult to understand why given the other evidence Agent Kowalski produced. Def. Mot. Sup. at 9-10. For instance, toll records indicate that Powell called the Williams Telephone immediately before his conversation with Page. Williams Wiretap Affidavit at ¶ 52. Thus, it is hardly "far-fetched" to infer that "Tom" is Defendant based on Powell's statement that he had "shouted Tom just now." Moreover, the observation that "money tree" is slang for "telephone" does not even require an inferential step; the exchange itself clearly shows that the participants used the terms interchangeably. Finally, Agent Kowalski's belief that Defendant used the Williams Telephone to traffic narcotics is entirely reasonable, given that CI-1 observed Defendant discussing narcotics activity over one of Defendant's previously used telephones, the 5943 Telephone.

 (3) The Williams Wiretap Extension

Defendant does not challenge seriously the Williams Wiretap Extension. Accordingly, the Court only will briefly summarize the overwhelming evidence supporting probable cause, a majority of which consisted of intercepted conversations from the Williams Wiretap. During one such conversation between Williams and an individual named D'Wayne Blackwood ("Blackwood"), Defendant stated that Blackwood "carried [Defendant's] weed and sold it to" a third party. Williams Extension Affidavit at ¶ 37. A few minutes later, Defendant threatened to murder Blackwood for stealing Defendant's marijuana. *Id.* at ¶ 38. In another telephone call between Defendant and a customer service representative from the United States Parcel Service, Defendant identified himself by an alias and referenced the delivery of a certain package. *Id.* at ¶ 39. Three days later, law enforcement agents intercepted a package containing nine pounds of marijuana addressed to Defendant's alias. *Id.* at ¶ 40. As this evidence clearly indicates at least a probability of criminal activity, Judge Matsumoto's probable cause determination regarding the Williams Wiretap Extension was more than justified.

(B)  Alternative Investigative Techniques

An application for wiretap authorization must provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). A judge reviewing an application for authorization of a wiretap must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed or to be too dangerous." 18 U.S.C. § 2518(3)(c). This "necessity" requirement was "designed to ensure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). While the government may not rely on "general and conclusory statements" to establish the futility of

alternate options, it "is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance." *United States v. Conception*, 579 F.3d 214, 218 (2d Cir. 2009) (internal quotation marks omitted); *United States v. Young*, 822 F.2d 1234, 1237 (2d Cir.1987) (internal quotation marks omitted) (stating that there is no requirement under Title III that "that any particular investigative procedures be exhausted before a wiretap may be authorized"). The Second Circuit has noted that "wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." *United States v. Steinberg*, 525 F.2d 1126, 1130 (2d Cir.1975). Additionally, wiretaps often are warranted in "complex and sprawling criminal cases involving large conspiracies." *Conception*, 579 F.3d at 218.

Defendant challenges the necessity of the wiretaps on the ground that they are supported by "boilerplate language" regarding the availability of alternative techniques. Def. Mot. Sup. at 10. He asserts that Agent Kowalski's affidavits did not connect this alleged boilerplate to the facts of this case. *Id.* at 11. This proposition is patently false.

Although agent Kowalski's affidavits do contain some language that may be described as "stock" or "boilerplate," they are also replete with relevant facts. Indeed, almost every one of the alternative investigative techniques discussed is tied directly to an issue particular to this investigation. For example, Agent Kowalski discussed the limitations of confidential sources, explaining that the existing informants were not members of the Bloodstains and were unable to "penetrate the organization fully, or identify all of its members, suppliers, or customers." Powell Wiretap Affidavit at ¶¶ 70-71. Regarding undercover agents, Agent Kowalski noted that one confidential informant, CI-4, indicated a willingness to introduce an undercover agent to members of the Bloodstains. *Id.* at ¶ 74. However, this approach was likely to fail because CI-4 was not a

member of the Bloodstains, and there was reason to believe that current members of the Bloodstains would keep any newcomers at arms length for a significant period of time. *Id.* Moreover, the risks attendant to infiltrating the Bloodstains, an organization that allegedly murdered rival drug dealers, cannot be overstated.

The various attempts to physically surveil Defendant and other Bloodstains members were not only fruitless, but dangerous. *Id.* at ¶ 77 (describing high speed car chase that ensued following attempt to conduct a traffic stop on vehicle in which Defendant was riding). Searching the garbage outside the Williams Apartment apparently was not feasible because the Bloodstains employed lookouts on Defendant's street and Defendant's garbage was comingled with garbage from other residences. *Id.* at ¶¶ 85-86. The affidavits contain numerous other examples of investigative measures that either did not succeed or were unlikely to succeed. *Id.* at ¶¶ 82-84, 87-94. These examples need not be detailed here because it is abundantly clear that the affidavits in question contained far more than mere boilerplate or "general and conclusory statements." *Kahn*, 415 U.S. at 153 n.12. In fact, although "not required to exhaust all conceivable investigative techniques," the government appears to have attempted or at least thoughtfully considered most of them. *Conception*, 579 F.3d at 218. In short, the government easily satisfied the necessity requirement of § 2518.

## II. The Search Warrant

As noted above, the standard for assessing probable cause is whether, under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. The issuing magistrate's initial probable cause determination "is entitled to substantial deference" and "is itself a substantial factor tending to uphold the validity of [a] warrant." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983)

(additional citations omitted). Additionally, "[t]o establish probable cause to search a residence, two factual showings are necessary—first, that a crime was committed, and second, that there is probable cause to believe that evidence of such crime is located at the residence." *Id.* (citing *United States v. Harris*, 403 U.S. 573, 584 (1971)).

Defendant argues that the government failed to establish that evidence of criminal activity would be found at the Williams Apartment. Def. Mot. Sup. at 12. He claims that the Williams Wiretap Affidavit relied exclusively on information supplied by CI-1 to establish the requisite nexus between the alleged criminal activity and the Williams Apartment. *Id.* at 14. According to Defendant, the veracity of the information supplied by CI-1 was questionable for two reasons. First, CI-1 himself was unreliable. *Id.* Second, the government did not corroborate the specific information provided by CI-1 that connected the Williams Apartment with the criminal activity. *Id.* at 16. Defendant's contentions are unconvincing.

Once again, an assumption underlying Defendant's argument proves to be unfounded. CI-1 was not the only source of information supporting the assertion that criminal activity occurred at the William's apartment. Law enforcement agents overheard Defendant discussing narcotics trafficking during several telephone calls intercepted through the Williams Wiretap. Search Warrant Affidavit at ¶¶ 26, 32-35. According to location data on the Williams Telephone, these conversations occurred in the vicinity of the Williams Apartment. *Id.* Thus, even without the information provided by CI-1, this wiretap information established a fair probability that evidence of criminal activity would be found at the place to be searched.

Defendant's arguments challenging the reliability of CI-1 and the information supplied by CI-1 are also unsupported. According to CI-1, Defendant conducted a variety of narcotics related activity out of the Williams Apartment and stored firearms at the Williams Apartment. *Id.* at ¶¶

8-9. The fact that this particular information was not corroborated is not fatal to its reliability. CI-1 was a reliable source for the reasons previously discussed, most significantly, the fact that some of the other information he supplied was corroborated by law enforcement agents. Prior corroboration of an informant's information permits the inference that "the informant is reliable and … other information that he provides, though uncorroborated, is also reliable." *Wagner,* 989 F.2d at 73; *see also Spinelli*, 393 U.S. at 427, 89 (White, J., concurring) ("Because an informant is right about some things, he is more probably right about other facts."). CI-1 was right about the date and times he observed Defendant discuss narcotics activity in the Williams Apartment, as demonstrated by toll records; CI-1 was therefore probably right about the fact that Defendant conducted other narcotics activity at the Williams Apartment and stored weapons there. Accordingly, the information supplied in the Williams Wiretap Affidavit satisfied the probable cause standard for the issuance of the Search Warrant.

### III. Defendant's Post-Arrest Statements

Defendant does not urge suppression of his post-arrest statements based on any violation of his *Miranda* rights. *See* Def. Mot. Sup. at 17-19. Instead, he claims that his statements should be suppressed under the "fruit of the poisonous tree" doctrine announced in *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). *Id.* at 18. He argues that his statements were the "fruit" of his unlawful arrest, which in turn was the "fruit" of the defective Search Warrant. *Id.* As the Court has upheld the validity of the wiretaps and the Search Warrant, Defendant's "fruit of the poisonous tree" argument fails.

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress is denied in its entirety.

SO ORDERED.

Dated: Brooklyn, New York
August 11, 2016

                                                  /s/
                                    DORA L. IRIZARRY
                                       Chief Judge