UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
UNITED STATES OF AMERICA,                           :
                                                    :
                -against-                           :
                                                    :                **MEMORANDUM AND ORDER**
                                                    :                13-CR-419 (S-2) (DLI)
RONALD WILLIAMS,                                    :
also known as "Blackman,"                           :
"Jermaine," "Leon Gordon,"                          :
and "Marcus Reese,"                                 :
                                                    :
                        Defendant.                  :
------------------------------------------------------------ X

**DORA L. IRIZARRY, Chief Judge:**

On October 16, 2015, the government filed a motion: (1) for an anonymous and partially sequestered jury, and (2) to admit certain evidence. *See* Government's Motion ("Gov't Mot."), Dkt. Entry No. 175. Defendant[1] opposed it. *See* Defendant's Memorandum in Opposition ("Def. Op."), Dkt. Entry No. 179. For the reasons set forth below, and as set forth in the record of the hearing dated January 12, 2016, the government's motion is granted in part and denied in part as follows: (1) the request for an anonymous and partially sequestered jury is granted; (2) Defendant's post-arrest statement is admitted;[2] (3) lawfully intercepted recordings of Defendant's telephone calls are admitted; (4) the testimony of cooperating witness number one ("CW One") is admitted; (5) the testimony of cooperating witness number two ("CW Two") is excluded; and (6) limited testimony regarding the October 2, 2009 traffic stop is admitted, but evidence that the police recovered firearms and marijuana as a result of that traffic stop is excluded.

---

[1] Unless otherwise indicated, the Court incorporates into this Memorandum and Order all party-name abbreviations and designations from the Memorandum and Order dated August 11, 2016 (the "August 11 Order," Dkt. Entry No. 236).

[2] The Court previously denied Defendant's motion to suppress his post-arrest statement in the August 11 Order. Accordingly, the issue is moot and will not be addressed further herein.

## BACKGROUND

**I.     The Crimes Charged**

On August 15, 2013, the government filed a superseding criminal complaint against Defendant based on information obtained pursuant to a law enforcement investigation. *See* Complaint, Dkt. Entry No. 15. The target of the investigation was a violent street gang operating out of Brooklyn, New York known as the Bloodstains. *Id.* at ¶ 2. According to the Complaint, the Bloodstains' criminal activities included narcotics trafficking, armed robberies of rival drug dealers, and other acts of violence, including murders. *Id.*

An individual named Godfried Martin, also known as "Rev" ("Martin"), led the Bloodstains until he was deported to Jamaica in 2009 following his conviction for marijuana related crimes. *Id.* at ¶ 4. Both Defendant and an individual named Sheldon Shorter, also known as "Junglist" and "Jungle Man" ("Shorter"), were members of the Bloodstains who worked directly for Martin. *Id.* In 2009, Shorter was convicted of participating in a marijuana distribution conspiracy and sentenced to 328 months' incarceration. *Id.* Defendant assumed control of the Bloodstains' operations after the convictions of Martin and Shorter. *Id.*

As part of its investigation of the Bloodstains, the government sought and received judicial authorization for a wiretap on a telephone used by Defendant. *Id.* at ¶ 7. Pursuant to this wiretap, law enforcement agents intercepted numerous telephone calls in which Defendant discussed narcotics trafficking with other members and associates of the Bloodstains. *Id.* at ¶ 8. On several of the calls, Defendant threatened violence against other individuals involved in the drug trade in connection with narcotics trafficking. *See Id.* at ¶ 10-12. On April 30, 2013, co-defendant Leon Campbell ("Campbell") and Defendant participated in several calls in which Campbell hired Defendant to murder an individual that Campbell believed was providing information to law

enforcement. *Id.* at ¶ 31. During one of these calls, Defendant stated that he had spoken to other individuals concerning the murder contract. *Id.* On several other occasions in April 2013, law enforcement agents recorded Defendant and Campbell planning robberies of other drug dealers. *Id.* at ¶¶ 33-35.

Based, in part, on information discovered through these wiretaps, the government obtained a search warrant for Defendant's apartment located in Brooklyn, New York. *Id.* at ¶ 26. On August 6, 2013, law enforcement agents searched the Williams Apartment and found three pounds of marijuana and a loaded firearm. *Id.* The agents also obtained consent from another building resident to search the roof of the building in which the Williams Apartment was located. *Id.* The ensuing search of the roof resulted in the discovery of two additional firearms, a box of ammunition, and one loose round of ammunition. *Id.*

The agents arrested Defendant and advised him of his *Miranda* rights, which he waived. *Id.* at ¶ 30. Defendant admitted to the agents that he sold marijuana and directed others in selling marijuana. *Id.* He also stated that he assumed a leadership position within the Bloodstains following the arrest of Shorter. *Id.* Defendant denied ownership of any of the firearms recovered during the search of the Williams Apartment and rooftop. *Id.* He acknowledged participating in telephone calls with Campbell regarding the murder contract and the robberies of other drug dealers. *Id.* at ¶ 37.

On April 20, 2015, a grand jury within the Eastern District of New York returned a second superseding indictment[3] charging Defendant with: (1) participating in a marijuana distribution

---

[3] On July 16, 2013, a grand jury within the Eastern District of New York returned the initial indictment charging only co-defendant Campbell with drug trafficking and other murder related crimes. On September 5, 2013, a grand jury within the Eastern District of New York returned the first superseding indictment (the "First Superseding Indictment"), adding Williams as a defendant to some, but not all of the charges brought against Campbell in the original indictment.

conspiracy in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C) (Count One); (2) conspiracy to commit obstruction of justice murder in violation of 18 U.S.C. §§ 1512(k) and 1512(a)(3)(B)(i) (Count Two); (3) participating in a murder-for-hire conspiracy in violation of 18 U.S.C. § 1958(a) (Count Three); (4) being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2) (Count Five); (5) use of a firearm in connection with drug trafficking crime and crimes of violence in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Six); and (6) Hobbs Act robbery conspiracy in violation of 18 U.S.C. § 1951(a) (Count Seven). *See* Second Superseding Indictment, at 1-4.[4]

## II. Witness Intimidation and Defendant's Prior Convictions

On December 3, 2007, Defendant was charged with, *inter alia*, attempted murder in New York State Supreme Court, Kings County, Criminal Term, Indictment Number 12010/2007. Gov't Mot. at 9. It was alleged that, on October 25, 2007, Defendant shot the victim twice following a verbal confrontation involving members of the victim's family. *Id.* at 9-10. The victim identified Defendant as the shooter in a line-up and testified before the grand jury that Defendant shot him. *Id.* at 9. Similarly, the victim's wife, father, and two cousins also told the police that Defendant shot the victim. *Id.* However, at trial the victim and his family members testified that they could not identify the shooter. *Id.* at 10.

Only one witness identified Defendant as the shooter at trial, and during his testimony, one of Defendant's associates motioned toward the witness by forming his hand into the shape of a gun and making other hand gestures. *Id.* at 10. A court officer approached the individual and told

---

The First Superseding Indictment also added a firearms charge against Williams only, and another firearms charge against both Williams and Campbell.

[4] The Second Superseding Indictment charges Campbell as to Counts One, Two, Three, Four (Solicitation of Murder in violation of 18 U.S.C. § 373), and Seven.

4

him to stop. *Id.*, Ex. A at 300-301. Two jurors noticed the individual's hand gestures and brought the issue the judge's attention during a break in the proceedings. *Id.* The judge noted on the record that the individual in question attempted to "stare down" the judge and the judge's law clerk. *Id.*, Ex. A at 300. The judge also asked Defendant for information about the individual, because it appeared as though he was "trying to intimidate the witness and the jury as well as the Court." *Id.*, Ex. A at 300.

In light of the witnesses' refusal to testify against Defendant, the case was not submitted to the jury. *Id.* at 11. Instead, Defendant pled guilty to the reduced offense of felony attempted assault, and was sentenced to 18 months to 3 years' incarceration. *Id.*

Defendant's other convictions include: (1) criminal possession of a firearm in 2010 (the conduct for which occurred while Defendant was on bond for the attempted murder); (2) drug possession in 2004; (3) manufacture and possession of controlled substances with intent to distribute in 2000; and (4) attempted unauthorized use of a vehicle without the owner's consent in 1999.

## DISCUSSION

### I. Anonymous and Partially Sequestered Jury

The government requests that the Court: (1) not disclose the names, addresses, and workplaces of the venire and petit juries; (2) direct the jurors to eat lunch together; and (3) direct the Marshals to escort the jurors in and out of the courthouse. The government contends that, in light of Defendant's background and the seriousness of the charges, such measures are necessary to ensure the jury's safety and impartiality. Defendant argues that the government's proposals would unnecessarily burden the presumption of innocence and his opportunity to conduct a meaningful *voir dire*. The Court agrees with the government that its proposals are both reasonable

and necessary.

"The decision whether or not to empanel an anonymous jury is left to the district court's discretion." *United States v. Gotti*, 459 F.3d 296, 345 (2d Cir. 2006). In resolving motions for anonymous and partially sequestered juries, courts must balance "the defendant's interest in conducting meaningful *voir dire* and in maintaining the presumption of innocence, against the jury's interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict." *United States v. Quinones*, 511 F.3d 289, 295 (2d Cir. 2007) (holding that the district court did not abuse its discretion in impaneling an anonymous jury). It is well settled in the Second Circuit that, "when genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional rights"; however, analysis of the potential constitutional impact of an anonymous jury on a defendant "must receive close judicial scrutiny and be evaluated in the light of reason, principle and common sense." *United States v. Vario*, 943 F.2d 236, 239 (2d Cir. 1991). It is appropriate to impanel an anonymous jury when: (i) there is "strong reason to believe that the jury needs protection," and (ii) reasonable precaution is taken "to minimize the effect that such a decision might have on the jurors' opinions of the defendants." *Gotti*, 459 F.3d at 345.

Factors that courts have considered in determining whether to impanel an anonymous jury include: "(1) the seriousness of the charges; (2) the dangerousness of the defendants; (3) the defendant's ability to interfere with the judicial process by himself or through his associates; (4) previous attempts to interfere with the judicial process by the defendant or his associates; and (5) the amount of public and media attention expected during the trial that might expose the jurors to extraordinary pressures that could impair their ability to be fair." *United States v. Locascio*, 357 F. Supp.2d 558, 560 (E.D.N.Y. 2005) (collecting cases); *United States v. Mayes*, 2013 WL

6175824, at *2 (E.D.N.Y. Nov. 25, 2013) (citing *Locascio*, 357 F. Supp.2d at 560). If a court, based on an evaluation of these factors, determines that an anonymous jury is warranted, it must protect the defendant's fundamental rights by conducting *voir dire* in a manner "designed to uncover bias as to issues in the cases and as to the defendant," and by providing the jurors with a "plausible and nonprejudicial reason for not disclosing their identities or for taking other security measures." *United States v. Thai*, 29 F.3d 785, 801 (2d Cir. 1994); *see also United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991).

Here, Defendant's previous attempts to interfere with the judicial process weigh significantly in favor of an anonymous jury. *See Quinones*, 511 F.3d at 295 ("We have identified strong reasons to believe that a jury needed protection in situations where the government demonstrated a defendant's willingness to tamper with the judicial process."); *Mayes*, 2013 WL 6175824, at *2 (collecting cases) ("Courts in this Circuit have repeatedly cited a history of interference with the judicial process as particularly strong evidence that the jury is in need of protection."); *Locascio*, 357 F. Supp.2d at 561 (quoting *Vario*, 943 F.2d at 240) ("The most compelling factor justifying an anonymous jury in this case is the defendant['s] demonstrated willingness to 'tamper . . . with the judicial process.'"). At Defendant's attempted murder trial, multiple witnesses who previously identified Defendant as the shooter refused to testify against him. Their sudden reluctance to identify Defendant strongly suggests that he and/or his associates intimidated them into silence. Indeed, this conclusion is warranted particularly in light of the brazen attempt to intimidate a witness, the trial judge, and the judge's staff *during trial*, in full view of the jury. Even more troubling is the fact that Defendant's witness intimidation was at least partially successful, in that he secured a favorable plea bargain given the severity of the original charge. In short, the Court is convinced, based on the circumstances of the attempted murder trial,

that an anonymous jury is appropriate here. *See United States v. Vernace*, 2013 WL 142373, at *3 (E.D.N.Y. Jan. 11, 2013) (anonymous jury warranted, in part, because two key witnesses recanted their testimony prior to the defendant's previous trial in state court for murder). However, there is more to support this conclusion.

Defendant's conduct at his attempted murder trial was not his only foray into witness tampering. In this case, Defendant is charged with participating in a conspiracy to murder someone suspected of providing information to law enforcement. As the Second Circuit has noted, "[a]n obstruction of justice charge . . . has always been a crucial factor in our decisions regarding anonymous juries." *Vario*, 943 F.2d at 240. Here, not only has the government brought an obstruction charge, it has supported this charge with intercepted phone conversations in which Defendant himself agreed to the murder contract. The strength of this evidence distinguishes this case from the cases cited by Defendant, such as *United States v. Millan-Colon*, 834 F. Supp. 78, 84 (S.D.N.Y. 1993), where the court denied a request for an anonymous jury, in part, because the evidence supporting the government's jury tampering allegation was found wanting. *See Id.* (evidence consisted of: (1) defendants' active participation in jury selection during a previous trial and (2) "unverified and unsworn triple hearsay" from a confidential informant). In this case, evidence of Defendant's willingness to interfere with the judicial process comes in the form of Defendant's own recorded statements. As such, it provides a compelling reason to anonymize the jury.

The dangerousness of Defendant is another factor that supports the government's request. First, Defendant's witness tampering in the attempted murder case was not accomplished through bribery or some other non-violent means, but through threats of violence; similarly, he allegedly attempted to tamper with a witness in this case by agreeing to murder said witness. Second,

Defendant's own words, recorded on lawfully intercepted telephone calls, overwhelmingly demonstrate a propensity for violence. The transcripts of these recording are replete with instances in which Defendant directly and graphically threatened violence against the other participant in the telephone call. *See e.g.*, Gov't Mot. at 23 (during a call with an individual identified as "Blue," Defendant stated: "I'm able to kick your door off and shoot you in your face already. . . . If I ain't care about you, you think you could walk these f**king streets ni**er?"); *Id.* at 5 (during a call with an individual named Dwayne Blackwood, who was also known as "Butcher," Defendant accused Blackwood of stealing his "weed," and stated: "I want you to remember I know where you live and you to take it as a threat. You hear, you better look over your shoulder, Butcher. . . . Butcher, go and suck your mother, and bring my thing before the evening is done or I'm going to put you in a body bag. Listen to me, I swear to you. I'm going to put you into a body bag. . . ."). On numerous other occasions during these intercepted calls, Defendant discussed committing violence against a third party. *See e.g. Id.*, at 23 ("I had a thing in his face and it wouldn't fire."); *Id.* (regarding someone believed to be providing information to law enforcement, Defendant stated: "I want that p**sy to come home and hit him in the head with one."); *Id.* ("I am not taking talk from any man. If a boy is talking to me he has to have his gun on him."). Third, although Defendant's 2007 attempted murder trial ended with Defendant pleading to a lesser crime, the circumstances surrounding that case strongly suggest Defendant was the shooter. Finally, Defendant was a member and leader of a violent street gang. In short, it is beyond peradventure that this factor weighs in favor of jury anonymity.

With respect to anticipated media coverage, the government argues that "the local press has taken interest in similar cases in the past," and that "publicity would increase the possibility that jurors would be exposed to intimidation or harassment." *Id.* at 16 (citing *United States v.*

*Gammarano*, 2007 WL 2077735, at *6 (E.D.N.Y. July 18, 2007)). While Defendant acknowledges the possibility of some media interest, he states, accurately, that there "has been no known media attention so far." Def. Op. at 6. Defendant does not object, however, "to a procedure that allows the parties access to the names and other information concerning the jurors while withholding that information from the public record." Nor does Defendant object to withholding juror's names and identifying information from Defendant himself, so long as his attorney can access the information. *Id.* The Court finds that, irrespective of the potential media coverage of this case, the seriousness of the charges, Defendant's prior attempts to tamper with the judicial process, and Defendant's willingness to engage in violence provide a "strong reason to believe that the jury needs protection." *Gotti*, 459 F.3d at 345. Accordingly, the Court finds that an anonymous, semi-sequestered jury is appropriate.

Having found that an anonymous jury is warranted, the Court must protect Defendant's fundamental rights by conducting *voir dire* in a manner "designed to uncover bias as to issues in the cases and as to the defendant," and provide the jurors with a "plausible and nonprejudicial reason for not disclosing their identities." *Thai*, 29 F.3d at 801; *see also Gotti*, 459 F.3d at 345. The Court finds that a jury questionnaire that provides the parties with detailed information about potential jurors will allow Defendant to make informed decisions during jury selection. The juror's names, addresses, and places of employment are not vital to Defendant's ability to uncover bias among jurors. Additionally, an appropriate instruction to the jury may "minimize the effect that [anonymity] might have on the jurors' opinions of the defendant[]." *Gotti*, 459 F.3d at 345. To that end, the Court will instruct the jury that: (1) their privacy and their identities require protection from the media and the public; (2) anonymity will allow them to feel more comfortable giving candid answers to the personal questions asked in the jury questionnaires; and (3) that they are

being escorted in and out of the courthouse to protect their privacy and to ensure a timely start to each day of the trial.

In sum, the government's motion for an anonymous and partially sequestered jury is granted, as is its request for an appropriate jury instruction.

## II. Admissibility of Other Evidence

The government seeks to admit a variety of evidence as either direct evidence of the crimes charged, as background evidence to explain the relationships among the co-conspirators, or as other acts evidence under Rule 404(b). Defendant argues it would be premature to admit this evidence before the defense has presented its theory of the case. He claims that the proffered evidence is only relevant to the question of intent, which will not be a disputed issue at trial. Thus, according to Defendant, the government has offered only propensity evidence that should be excluded. For the following reasons, the evidence is admitted.

### (A) The Evidence

*Defendant's Statements from Lawfully Intercepted Telephone Calls*

The government moves to admit certain statements made by Defendant during lawfully intercepted telephone calls that occurred in March, April, and May of 2013. In several of the calls, Defendant discussed occasions in which he previously used a firearm, and in other calls, he threatened future use of a firearm. Defendant also discussed narcotics trafficking, his status as a "Don" in his neighborhood, and his relationship with Martin. During one intercepted call, Defendant spoke about a prior meeting he had with Shorter and another unindicted co-conspirator, Bobby Brown, also known as "Bobby Germs" ("Brown").

*Testimony of Cooperating Witnesses*

The government anticipates that its first cooperating witness, CW 1, would testify that,

during the period of the charged conspiracy, CW 1 conducted marijuana transactions with Defendant and observed Defendant possess a firearm on multiple occasions. CW 1 would testify further that, beginning in approximately 2000, CW 1, Shorter, Brown, and Defendant all participated in the Bloodstains' narcotics distribution activities, which at the time were directed by Martin.

CW 2 would testify that he and Defendant engaged in marijuana transactions prior to the period of the charged conspiracy. The government further expects CW 2 to testify that he met Defendant through Shorter in 2001, and that CW 2, Shorter and Defendant were all members of a marijuana distribution conspiracy operating under the leadership of Martin. CW 2 would testify that Defendant assumed leadership of the Bloodstains in approximately 2006, and that CW 2 ceased contact with Defendant in 2009 following a marijuana related dispute.

*Defendant's Prior Firearm Conviction*

On October 2, 2009, officers from the New York Police Department ("NYPD") stopped a vehicle occupied by Defendant, Brown, and another individual. The officers recovered one pound of marijuana and two firearms secreted inside a "trap" within the vehicle. On May 17, 2010, Defendant was convicted of Criminal Possession of a Weapon in the Third Degree, a felony. The government moves to admit the conviction and the underlying incident through the testimony of one of the officers involved in the stop.

**(B)** **The Legal Standard**

Rule 404(b)(1) states that "[e]vidence of a crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed.R.Evid. 404(b)(1). However, under subsection (b)(2) "this evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation,

plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* at (b)(2). With respect to other crimes evidence, the Second Circuit follows "an inclusionary rule," under which district courts may admit other crimes evidence "for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence." *Carboni*, 204 F.3d at 44. However, "this inclusionary approach does not invite the government 'to offer, carte blanche, any prior act of the defendant in the same category of crime.'" *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009) (quoting *United States v. Garcia*, 291 F.3d 127, 137 (2d Cir.2002) (additional citations omitted)).

Rule 404(b) does not necessarily apply to all uncharged prior bad acts. In the Second Circuit, "[e]vidence of uncharged criminal activity is not considered other crimes evidence under [Rule] 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *Carboni*, 204 F.3d at 44 (quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir.1997)). Accordingly, "[where] the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself." *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir.1999) (internal quotation marks and citations omitted); *see also United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992) ("An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged.").

**(C) Application**

The lawfully intercepted telephone conversations at issue all concern Defendant's use or possession of a firearm, his marijuana transactions, his status as a gang leader, or his interactions

13

with co-conspirators. As these conversations occurred during the period of the charged conspiracy, they are direct evidence of the crimes charged, and are not "other acts" within the meaning of Rule 404(b). Similarly, any testimony from CW 1 concerning Defendant's firearms possession or marijuana transactions that occurred during the relevant period is also admissible as direct evidence.

Although CW 1's testimony concerning events that occurred prior to the charged conspiracy is not direct evidence, it is still admissible under the applicable case law. The government has proffered that, with respect to events that occurred prior to the relevant period, CW 1 will testify about the Bloodstains' operations, Martin's leadership, and several of the gang's key operatives, including Defendant. This testimony will enable the jury to understand the origins of Defendant's participation in the Bloodstains gang and the charged conspiracy, as well as the relationships between the co-conspirators. Accordingly, this testimony is admitted as it is inextricably intertwined with the evidence concerning the charged offenses and is "necessary to complete the story of the crime on trial." *Carboni*, 204 F.3d at 44.

As for CW 2, the government has conceded that his or her testimony would only cover events that occurred prior to the period covered in the indictment, and would largely consist of the same background information provided by CW 1. While the government argues that such testimony is corroborative, in the Court's view, CW 2's testimony would be cumulative. Accordingly, although the testimony of CW 2 is relevant, its probative value is minimal, and, therefore, is "substantially outweighed by [the] danger of . . . unfair prejudice [and] . . . needlessly presenting cumulative evidence." Fed.R.Evid. 403; *Carboni*, 204 F.3d at 44 (to be admissible, relevant evidence must satisfy "the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence."). However, the government is granted leave to make an appropriate

application to revisit this ruling at trial if warranted by a change in circumstances.

Finally, the marijuana and the gun from the 2009 traffic stop, as well as the ensuing 2010 firearms conviction, must be excluded under Rule 404(b). The government urges the Court to admit this evidence under the theory that, in the 2009 stop, Defendant secreted the drugs and guns in a vehicle trap, and evidence from this case indicates that Defendant similarly transported guns and drugs in vehicle traps during the period of the charged conspiracy. These similarities, the government argues, are sufficient to warrant admissibility, because they suggest a methodology or *modus operandi* for secretly transporting drugs and guns. While prior acts evidence may be admissible to demonstrate *modus operandi*, the evidence must "share unusual characteristics with the act charged or represent a unique scheme." *Berkovich v. Hicks*, 922 F.2d 1018, 1022 (2d Cir.1990)); *see also Stephen v. Hanley*, 2009 WL 1471180, at *12 (E.D.N.Y. May 21, 2009) (quoting *United States v. Benedetto*, 571 F.2d 1246, 1249 (2d Cir.1978) ("The device used must be so unusual and distinctive as to be like a signature."). As the case law of this Circuit demonstrates, transporting contraband in a secret vehicle compartment is hardly "unusual" or "unique." *See e.g.*, *United States v. Flores*, 109 F. App'x 463, 464 (2d Cir. 2004) (cocaine discovered in vehicle trap); *United States v. Gonzalez*, 443 F. App'x 588, 590 (2d Cir. 2011) (cash discovered in vehicle trap). Indeed, that the term "trap" has developed to describe such a secret vehicle compartment underscores its ubiquity. In short, introducing the guns or marijuana from the 2009 vehicle stop, or the resulting 2010 conviction, would implicate precisely the propensity inference that Rule 404(b) is intended to prevent.

In the alternative, the government seeks to admit the fact that Defendant, Brown, and a third individual were the occupants of the vehicle at the time of the stop. The evidence would be admitted through the testimony of the officer who performed the stop. The officer would testify

as to the reason for the stop and the vehicle's occupants, but not the guns or drugs discovered in the trap. According to the government, this evidence demonstrates the existence of a longstanding relationship between Defendant and Brown. Because other evidence establishes that Brown was a member of the conspiracy, the Court agrees with the government that this evidence is relevant for corroborating the existence of this relationship, and is hereby admitted for that limited purpose.

## CONCLUSION

For the foregoing reasons, the government's motion is granted in part and denied in part as follows: (1) the request for an anonymous and partially sequestered jury is granted; (2) Defendant's post-arrest statement is admitted; (3) lawfully intercepted recordings of Defendant's telephone calls are admitted; (4) the testimony of CW One is admitted; (5) the testimony of CW Two is excluded; and (6) limited testimony regarding the October 2, 2009 traffic stop is admitted, but evidence that the police recovered firearms and marijuana as a result of that traffic stop is excluded, as is the resulting 2010 conviction.

SO ORDERED.

Dated: Brooklyn, New York
      August 30, 2016

                                                /s/
                                    DORA L. IRIZARRY
                                        Chief Judge